**E-FILED**
Thursday, 10 January, 2013  01:10:53 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |  |
|---|---|---|
| CHANNING S. VANWINKLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   11-cv-1403 |
| | ) | |
| MICHAEL ASTRUE, *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Affirmance, both addressing this Court's review of Defendant's final decision denying Social Security benefits to Plaintiff. (Docs. 17 & 21). For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Affirmance is granted.

### STANDARD OF REVIEW

To be entitled to disability benefits under the Social Security Act, a claimant must prove that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. *See McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to decide whether the claimant is presently involved in a substantially gainful activity. 20 C.F.R. §§ 404.1520(a)(i), 416.920(a)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. §§ 404.1520(a)(iii), 416.920(a)(iii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements of one of the Listings are met or equaled, he declares the claimant eligible for benefits. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv); 20 C.F.R. Part 404, Subpart P, Appendix 1.

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps. At the fourth step, the claimant's residual functional capacity ("RFC") is evaluated to determine whether the claimant can pursue his past work. 20 C.F.R. §§ 404.1520(a)(iv), 416.920(a)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy. 20 C.F.R. §§ 404.1520(a)(v), 416.920(a)(v). If the claimant is disabled, but there is evidence of drug or alcohol abuse, the Commissioner must consider whether the claimant would still be considered disabled if he stopped using drugs and/or alcohol; if not, he cannot receive benefits. 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535.

The claimant has the burden to prove disability through step four of the analysis, *i.e.*, he must demonstrate an impairment that is of sufficient severity to preclude his from pursuing his past work. *McNeil*, 614 F.2d at 145. However, once the claimant shows an inability to perform his past work, the burden shifts to the Commissioner, at step five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id*.

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Court must ensure that the administrative law judge ("ALJ") "build[s] an accurate and logical bridge from the evidence to his conclusion," even though he need not have addressed every piece of evidence. *Id*. at 872.

BACKGROUND

## I.    Procedural History

Plaintiff filed an application for disability benefits on March 6, 2009. (Tr. 125,

147).[1] His claim was denied initially and upon reconsideration. (Tr. 70-79). Plaintiff

requested a hearing, which was held on August 25, 2010. (Tr. 11-41, 80-81).

Following the ALJ's December 16, 2010 decision denying benefits, Plaintiff filed a

request for review by the Appeals Counsel, which was denied on September 29,

2011. (Tr. 65-68, 123). Plaintiff then filed the instant action on November 7, 2011

pursuant to 42 U.S.C. § 405(g). (Doc. 1).

## II.    Relevant Medical History[2]

On November 11, 2008, Plaintiff was admitted to the hospital following an

overdose of medication with alcohol; his mother reported that he had been

depressed lately. (Tr. 219). He reported to a nurse that he had recently broken up

with his girlfriend, and had lost his job. (Doc. 352). While in the hospital, Plaintiff

stayed in his room, refusing to attend group therapy or to socialize with other

patients. (Tr. 352). A provider believed that he would benefit from inpatient care, as

well as a referral to a community support program. (Tr. 416). On November 12,

---

[1]     The transcript in this matter is found in the docket at docket entry 14, and is
cited in this opinion as "Tr.," using the pagination assigned by the Social Security
Administration.

[2]     As noted above, the Court will review the entire administrative record, but
focuses its discussion and analysis on the issues and evidence raised by the parties.
Local Rule 8.1(D) provides that "[t]he plaintiff must cite to the record by page
number the factual evidence which supports the plaintiff's position," and the Court
does not scour the record for additional evidence that might support a plaintiff's
claims. Especially where a plaintiff is, as here, represented by counsel, the failure to
cite particular pieces of evidence in the record must constitute a waiver of the
plaintiff's reliance on that evidence.

4

2008, Plaintiff was still somewhat of a threat to himself; acknowledged the need to recover, but was not ready to engage in a discussion about the necessary actions; was unable to understand his disease and its management; and was inconsistent with taking his medications. (Tr. 360-61).

Upon his November 14, 2008 discharge, Plaintiff reported that he would live with his brother, and that he would seek counseling through his church. (Tr. 420). Dr. Eric Ritterhoff, who had been treating Plaintiff during his stay, noted in his discharge summary that, during his admission, Plaintiff had not shown "ongoing depression, sadness, hopelessness," and that he had denied being suicidal. (Tr. 321). Plaintiff had been advised that he needed to remain in the hospital longer in order to get the full effect of his medication, but he was discharged against medical advice. (Tr. 321). Plaintiff initially complained of upset stomach caused by his medication, but Dr. Ritterhoff had prescribed a medication to alleviate that problem. (Tr. 321). As to his work abilities, Dr. Ritterhoff noted that Plaintiff "talked in a categorical fashion with no insight as to not being able to work," and that Plaintiff had reported some problems with concentration and nervousness. (Tr. 321-22). Dr. Ritterhoff questioned Plaintiff's prognosis, as it was uncertain whether he would follow through with treatment. (Tr. 322).

Plaintiff participated in formulating an Individual Treatment Plan on November 21, 2008. (Tr. 442-43). He stated that he would "continue to maintain [his] mental health by taking [his] medication;" the clinician noted that he was capable of self-medication. (Tr. 442-43).

Dr. Ritterhoff saw Plaintiff on December 5, 2008. Dr. Ritterhoff reported that Plaintiff was dwelling on his negative feelings over having lost his girlfriend, apartment, and job, but was exploring getting a different doctor in order to avoid the topic of having to work on his behavior rather than merely getting new medications, especially an antidepressant. (Tr. 495). Dr. Ritterhoff explained that Plaintiff was not having "biologic depression," but was merely experiencing natural negative feelings, and so questioned the need for an antidepressant medication. (Tr. 495).

At Plaintiff's December 19, 2008 visit with Dr. Ritterhoff, the doctor noted that Plaintiff was beginning community support program services. (Tr. 494). Dr. Ritterhoff found no evidence of depression, sadness, or hopelessness, but Plaintiff showed "low productivity" and reported that he could not "make himself do anything." (Tr. 494). In order to show that he could control himself, Dr. Ritterhoff advised Plaintiff to begin a behavioral program of activity, beginning with walking every day for an hour, followed by beginning to attempt some sort of work. (Tr. 494).

Plaintiff reported having a problem with concentration in January 2009, but rejected Dr. Ritterhoff's offer of treatment for that issue; he had not begun the behavioral program suggested at the previous visit. (Tr. 493). In February 2009, Plaintiff refused Dr. Ritterhoff's suggestion of going to a day hospital for additional treatment, though Dr. Ritterhoff "explicitly advised" him that he needed "more intensive therapy." (Tr. 491). In apparent response to Plaintiff's statements, Dr. Ritterhoff told him that the medical staff was not concerned about his Social Security status, as his problems will persist even if he gets Social Security; Dr.

Ritterhoff noted that Plaintiff was "focusing on money as a way to turn things around with poor psychological insight about his self defeating attitude and the need to get rid of that." (Tr. 491-92).

On March 13, 2009, Plaintiff was focused on obtaining an antidepressant during his visit with Dr. Ritterhoff, and dwelled on problems that were out of his control. (Tr. 489). Plaintiff was taking his medications. (Tr. 489). Plaintiff did not volunteer having any depressive symptoms, but, when given a list of such symptoms, claimed to have all of them. (Tr. 490). Plaintiff saw Dr. Ritterhoff again on March 30, 2009. He claimed to be depressed, but showed no remarkable symptoms; Plaintiff was still overly focused on himself and his feelings, and unwilling to consider efforts at change. (Tr. 487). Plaintiff insisted that he needed an antidepressant in addition to his Geodon, and so Dr. Ritterhoff prescribed one "purely to see if we can get beyond his argument that he needs an antidepressant." (Tr. 487). Dr. Ritterhoff scheduled another visit in three weeks, though Plaintiff wanted to go longer between visits. (Tr. 487).

Dr. Kirk Boyenga, a state agency consultant, completed a Psychiatric Review Technique and a Mental RFC Assessment of Plaintiff in April 2009. (Tr. 501-18). He found that Plaintiff showed inconsistent signs of depression, and that he had moderate restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace; Plaintiff had no extended episodes of decompensation. (Tr. 504, 511). There was also no evidence of the "paragraph C"

criteria under Listings 12.02, 12.03, 12.04, or 12.06.[3] (Tr. 512). Dr. Boyenga also found that, for most of the work-related items of the Mental RFC Assessment, there was either no evidence of any limitation or that Plaintiff was not significantly limited. (Tr. 515-16). Plaintiff was only moderately limited in his ability to maintain attention and concentration for extended periods, in his ability to sustain an ordinary routine without special supervision, in his ability to complete a normal workday and workweek and to perform and at a consistent pace, in his ability to intact appropriately with the general public, in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, in his ability to respond appropriately to changes in the work setting, and in his ability to set realistic goals or make independent plans. (Tr. 515-16). He opined that Plaintiff was capable of performing simple tasks, that he could work in a setting with limited interpersonal contact, that he could perform routine and repetitive tasks, and that he could follow instructions and travel independently. (Tr. 517).

On May 13, 2009, Dr. Ritterhoff reported that Plaintiff was not depressed, was not interested in making any behavioral changes, and was concerned only with obtaining Social Security benefits. (Tr. 522). Dr. Ritterhoff again noted that

---

[3]     "Paragraph C" differs somewhat in Listings 12.02-12.04 and 12.06. In Listings 12.02-12.04, "paragraph C" requires, *inter alia*,

> 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, 12.04-12.06(C). The "paragraph C" of Listing 12.06 requires a "complete inability to function independently outside the area of one's home."

Plaintiff's thoughts were centered "only around the issue of obtaining Social Security disability" in June 2009. (Tr. 521). He continued to resist suggestions such as a day hospital. (Tr. 521). Later in June, Plaintiff still refused to consider changing his medications, being hospitalized, or changing his behavior; Plaintiff refused to accept the need to change. (Tr. 725). Plaintiff was taking his medications as ordered in July 2009, but was focused only on medication as a solution. (Tr. 723).

Plaintiff was admitted to the hospital in August 2009. Dr. Ritterhoff found that Plaintiff was "preoccupied with himself,…and not making any effort to be in control of his life." (Tr. 536). He noted that Plaintiff had been "hard-working, conscientious, and very independent prior to the loss of employment." (Tr. 536). While hospitalized, Plaintiff did not attend group therapy, though it was part of his prescribed treatment plan. (Tr. 646, 648, 692). At the end of his hospital stay, Plaintiff had improved to the point where he recognized his need for medication and took it, though he needed reminders; he had "limited knowledge" of his disease process or its management. (Tr. 565, 561). In his discharge summary, Dr. Ritterhoff reported that Plaintiff still resisted all change, including refusing to consider other medications or behavioral treatments; Plaintiff would not commit to attending a community support program. (Tr. 532). Dr. Ritterhoff prescribed Cymbalta, but Plaintiff stated that he could not afford it and refused to consider donating plasma as a means of obtaining the needed money; just before his admission, Plaintiff had stated that he didn't like needles. (Tr. 532, 722). After his discharge, Plaintiff saw Dr. Ritterhoff again in August, and Dr. Ritterhoff reported that Plaintiff was still

resisting therapeutic recommendations and had not begun to attend the community support program. (Tr. 721).

In September 2009, Dr. Ritterhoff, rather than filling out a form seeking his opinion on Plaintiff's ability to perform work activities, wrote a separate note describing Plaintiff. (Tr. 738-40). He stated that Plaintiff is extremely rigid, and has no adaptability, that he has no social motivation or social control, has poor insight and poor awareness as a result of his severe preoccupation with his situation, would not accept certain medication and argued about therapy recommendations, did not have a pre-existing personality disorder or psychosis, and showed very little activity, instead dwelling on his problems. (Tr. 740).

In October 2009, Dr. Ritterhoff found that Plaintiff was not motivated to change or engage in any activities, though he was not depressed. (Tr. .748). Plaintiff reported that he had been following professional baseball and football. (Tr. 748). Plaintiff categorically stated to Dr. Ritterhoff that he could not work. (Tr. 748). Staff at the Robert Young Center completed an annual diagnostic re-assessment of Plaintiff in November 2009, in which it was noted that he "lack[ed] any motivation to try to improve his symptoms, [and] has turned down suggestions from staff yet continues to complain about his symptoms." (Tr. 757-59). The re-assessment also noted that Plaintiff refused to look into learning ways to cope, and failed to recognize that medication alone would not solve his problems. (Tr. 757). Plaintiff saw Dr. Ritterhoff in March 2010, who reported that he still refused any suggestions for change, insisting that the only answer was obtaining social security benefits. (Tr. 744). On June 22, 2010, Plaintiff saw Dr. Ritterhoff, who encouraged

him to "live in the present" and not dwell on negative thoughts. (Tr. 742). He was taking his medications, though when offered an additional prescription to help with stress, he refused. (Tr. 742).

## III.   Hearing Testimony

A hearing was held before ALJ John Wood on August 25, 2010, at which Plaintiff appeared, represented by counsel. (Tr. 11-41). Plaintiff testified that he lived with his parents, but was staying for a short while with his children and their mother. Plaintiff was driven to the hearing by his father, and he ordinarily drove only once a month or every other month, as he did not like to drive.

Plaintiff has a high school education, and most recently worked as a security guard, ending in March 2007 when he quit. He was not working at the time of the hearing. When questioned by his attorney, Plaintiff stated that he had quit because he had had a "breakdown." His attorney also elicited testimony that the stress of working a regular job would "stop [him] from wanting to go."

Plaintiff testified that he didn't feel that he could work because he had trouble motivating himself to do daily activities. He had trouble with showering, doing dishes, vacuuming, playing with his children, and going outside, as he didn't feel like doing anything. Though Plaintiff supervised his children getting ready for school and getting on the bus, he did not have to do much to help them. After the children were on the school bus, Plaintiff returned to bed, and then watched television until they came home from school. After supper, Plaintiff watched television, though sometimes he played games with the children. Plaintiff's attorney elicited testimony that he had trouble concentrating on television shows.

Plaintiff testified that he was taking the medications prescribed by Dr. Ritterhoff "religiously." He also testified that Dr. Ritterhoff had offered other medications, but that he had refused them. Upon questioning by his attorney, Plaintiff confirmed that he sometimes refused or argued about suggested treatments with which he did not agree. He testified, however, that he always took medications that had been prescribed. The only side effect of the medication Plaintiff noted was that he was sometimes tired.

Plaintiff drank alcohol about twice a month, and had four or five beers at a time. He had been drinking at that level since November 2008. Prior to November 2008, he would drink a 12-pack every day. He testified that his medication helped him to stop drinking, though he did not use any other aids in reducing his drinking.

Vocational expert George Paprocki also testified at the hearing. He had heard Plaintiff's testimony and had reviewed the evidence relating to Plaintiff's work history. The ALJ asked the vocational expert whether a person with Plaintiff's past work and no exertional limitations, but who is limited to only simple and repetitive work, with no interaction with the general public and only occasional interaction with co-workers and supervisors, could perform any of Plaintiff's past work. The ALJ testified that such a person would work as a furniture assembler, which is an unskilled position. Such a job would require the employee to work consistently throughout the work day. The ALJ next asked the vocational expert to consider whether that hypothetical person, but also with Plaintiff's age and education, could find work where the output was measured on a per-shift rather than a per-hour basis. The vocational expert testified that cleaning jobs would be available, and

would require only occasional contact with co-workers; this job would require that the worker be on-task 90 percent of the time. Only a standard number of breaks would be available, but there would be some flexibility as to when they were taken, and employers would tolerate no more than one and a half to one day off per month.

Plaintiff's attorney asked the vocational expert about a person with the same characteristics as the last hypothetical, but who was "inflexible, rigid, and non-adaptable,…in terms of dealing with any attempt to change his method of working or do work tasks." The ALJ noted that these terms were not within the vocational expert's expertise, as they were not "vocational," but asked the vocational expert to answer if he felt able. The vocational expert interpreted the attorney's question as referring to someone who was not receptive to a supervisor's suggestions, and who would be disrespectful of a supervisor, and testified that such a person would not be able to keep a job.

At the end of the hearing, Plaintiff's attorney offered to amend the alleged onset date to November 2008, due to Plaintiff's heavy drinking prior to that, if his drinking would negatively affect the ALJ's determination.

## IV.   ALJ's Decision

The ALJ issued his decision on December 16, 2010. (Tr. 47-60). The ALJ, after reviewing this case's procedural history and the applicable law, found that Plaintiff met the insured status requirements through December 31, 2012 and had not engaged in substantial gainful activity since March 7, 2007, his alleged onset date. He then determined that Plaintiff had the severe impairments of a history of alcohol abuse, a mood disorder, and suspected bipolar disorder.

The ALJ next considered Plaintiff's condition as it exists because he has not followed certain recommended or prescribed treatments. Without recommended treatment, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. He also found that, without recommended treatment, Plaintiff had the RFC to perform a full range of work at all exertional levels, but limited to simple and repetitive tasks, no interaction with the general public, only occasional interaction with co-workers and supervisors, and an ability to engage in less than full-time competitive sustained work owing to an inability to maintain a regular work schedule. The ALJ based this finding on Plaintiff's testimony and the medical evidence.[4] The RFC meant that Plaintiff was unable to perform any of his past relevant work, and, given Plaintiff's age, education, work experience, and RFC, the ALJ found that there were no jobs that Plaintiff could perform.

Pursuant to 20 C.F.R. § 404.1530, the ALJ found that Plaintiff had, without justifiable cause, failed to follow prescribed treatment that would be expected to restore his ability to work. He found that Plaintiff had been "pervasively noncompliant with the medical regimen prescribed and/or suggested by his treating psychiatrist Dr. Ritterhoff and other medical sources."[5] These include: a behavioral program of activity advised in December 2008, which Plaintiff did not undertake; a January 2009 refusal to discuss treatment options for difficulties with

---

[4]     The ALJ's findings on this question are quite thorough, but the Court does not review them in detail because they are not at issue here.

[5]     The ALJ included this and the following portion of his analysis later in the opinion, but the Court discusses it here for greater clarity.

concentration; February, March, and June 2009 refusals to consider a day hospitalization program for more intensive treatment; March 2009 and June 2009 refusals to discuss medication changes; March 2009 resistance to a suggestion of more-frequent treatment; August 2009 failure to attend group therapy, refusal to consider alternative medications, and refusal of post-hospitalization treatment; a later August 2009 refusal to consider behavioral modifications such as more social engagement; and November 2009 refusal of suggestions from medical staff.

The ALJ concluded that Plaintiff's refusal to follow these recommendations was not excusable as a result of his lack of mental capacity or lack of insight because of Dr. Ritterhoff's observations in August and October 2009 that he was able to self-medicate. The ALJ thus determined that Plaintiff simply chose not to pursue more effective treatment. He also noted that Plaintiff "appears to have no motivation except to collect benefits;" he suspected that this motivation might be behind Plaintiff's refusal to pursue treatment. The ALJ's suspicion was based on statements from Dr. Ritterhoff in February 2009, May 2009, June 2009, and March 2010. Finally, the ALJ noted that Plaintiff had been inconsistent on other topics, including his drinking habits, his medications, and the reason he stopped working. He therefore concluded that Plaintiff was not justified in refusing the treatment suggestions of Dr. Ritterhoff and his other treatment providers.

The ALJ found that if Plaintiff were to follow the prescribed treatment, his mental impairments, whether taken alone or together, would not meet or medically equal the criteria of Listings 12.04 or 12.06, because neither the "paragraph B" nor

the "paragraph C" criteria of either Listing would be satisfied.[6] The ALJ found that Plaintiff would have a moderate restriction in his activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, and pace, and no extended episodes of decompensation. In addition, the "paragraph C" criteria were not met because Plaintiff had no propensity to decompensate repeatedly, and did not need a highly supportive living arrangement.

The ALJ next evaluated what Plaintiff's RFC would be if he were to follow the prescribed treatment. He found that Plaintiff would have the RFC to perform the full range of work at all exertional levels, but would be limited to simple and repetitive tasks, no interaction with the general public, and only occasional interaction with his co-workers and supervisors. This RFC finding was supported by the evaluation of the state agency psychological consultant in April 2009. The ALJ did not give significant weight to Plaintiff's father's statement, because it did not take into account the effect of recommended treatment. The ALJ concluded that treatment would improve Plaintiff's condition to this extent because the medical evidence showed that during the periods when Plaintiff was compliant with the

---

[6]     Both Listings 12.04 and 12.06 require that claimants meet the requirements of either "paragraph B" or "paragraph C." "Paragraph B," which is identical in both listings, requires that the impairment result "in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.04(B) & 12.06(B). The "paragraph C" criteria are discussed above, in the medical history section.

types of treatments recommended, his symptoms improved, which would lead to a restored ability to work.[7]

Based on the vocational expert's testimony in response to a hypothetical concerning a person with Plaintiff's with-treatment RFC, the ALJ concluded that Plaintiff could, if he complied with prescribed treatment, perform his past relevant work as a furniture assembler, and that he was therefore not disabled.

DISCUSSION

**I.   Whether ALJ was justified in denying benefits on the basis of Plaintiff's failure to follow through with recommended treatment**

The ALJ found that, so long as Plaintiff failed to follow the treatments recommended by Dr. Ritterhoff he was unable to perform any of his past relevant work, and that there were no jobs that he could perform. However, he also found that if Plaintiff were to follow the recommended course of treatment, he would have the RFC to perform his past relevant work and thus would not be disabled. Social Security regulations provide that if a claimant unjustifiably fails to follow prescribed treatment that would restore his ability to work, he cannot be considered disabled and therefore cannot receive benefits.[8] 20 C.F.R. § 404.1530. Plaintiff now challenges the ALJ's determination that Plaintiff is not excused from refusing Dr. Ritterhoff's recommendations. He argues first that Dr. Ritterhoff's recommendations were not formal "prescriptions," and so Plaintiff's failure to follow

---

[7]   The ALJ's analysis of this point is quite detailed, but the Court need not review it exhaustively at this time because Plaintiff does not challenge the finding that the recommended treatments would improve his condition.

[8]   Plaintiff does not appear to challenge the ALJ's conclusion that adherence to these treatment recommendations would restore his ability to work, so the Court will not separately address that issue.

them did not violate the regulations. In addition, Plaintiff claims that his failure to follow these recommendations was a symptom of his mental illness, which should excuse his failure to comply. As noted above, the ALJ found that Plaintiff had refused behavioral changes, medication changes, day hospitalization, more-frequent treatment, and attendance at group therapy.

### A. Whether Dr. Ritterhoff's recommendations constitute "prescribed treatment" under § 404.1530

The regulation at issue refers to compliance with a "prescribed treatment." 20 C.F.R. § 404.1530(b). Because Dr. Ritterhoff did not formally write out a prescription for the treatments in question, Plaintiff claims that his recommendation did not constitute a "prescribed treatment." In support of this, he cites to *Cassiday v. Schweiker*, in which the Seventh Circuit, interpreting an earlier version of this regulation, stated that "the treatment must be 'prescribed.' Recommendations, suggestions, and abstract opinions are not enough." 663 F.2d 745, 749 (7th Cir. 1981) (citing *Schena v. Secretary of Health and Human Services*, 635 F.2d 15, 19 (1st Cir. 1980)). The question, then, is whether Dr. Ritterhoff's recommendations constitute "prescribed treatment."

It is true that the *Cassiday* court stated that "recommendations…are not enough." *Id*. However, as Defendant points out, *Cassiday*'s holding turned equally on the fact that "[n]othing in the record tie[d] the [recommended] surgery specifically to a restoration of [the claimant's] ability to work." *Id*. Moreover, *Cassiday* did not define the term "prescribed," and the term is not defined in the applicable regulations. It surely cannot only refer to writing out an order on a prescription pad. The Court therefore must attempt to define this key term.

The Court has reviewed numerous cases addressing this regulation, and while they all agree that the treatment must be "prescribed," none appear to actually define the word or use it in a manner that permits a definition to be implied; the parties have cited no such helpful cases, either.[9] Where there is no interpretive guidance in the regulations themselves or from other courts, the Court must return anew to the actual words used in the regulations. The Oxford English Dictionary lays out one meaning of the verb "prescribe" as "[t]o advise or order the use of (a medicine, remedy, treatment, etc.), esp. by a written prescription." OXFORD ENGLISH DICTIONARY, "prescribe" (Oxford University Press), available at http://www.oed.com/view/Entry/150644?redirectedFrom=prescribe (last accessed Jan. 7, 2013). Under this definition, a treatment that is merely "advised" would suffice, as would one that is "ordered," obviously including any sort of earnest recommendation.[10] Similarly, the relevant definition of the term "prescribed," which is the precise word used in the regulation, is that it is an adjective describing that which is "[o]f a remedy or treatment: advised or recommended by a doctor; spec. (of a medicine) available or authorized by a doctor's written prescription." OXFORD ENGLISH DICTIONARY ONLINE, "prescribed" (Oxford University Press) available at

---

[9]   Most cases instead focus on whether the treatment would improve the claimant's condition or whether the claimant was justified in refusing the treatment. Some cases also address doctors' recommendations to lose weight or stop smoking, which courts have typically found to be outside the scope of § 400.1530, as those two recommendations require massive, very difficult changes in behavior, and are often beyond the abilities of claimants, even when they attempt to comply.

[10]   The Court notes that the term "order" is itself problematic, as it could imply either "ordering" a treatment, in the sense of requesting a medication from a pharmacy, or authoritatively commanding someone to undertake a treatment. As doctors in most situations have no true power to command their patients to take any action, this latter sense cannot control the analysis.

http://www.oed.com/view/Entry/150645?redirectedFrom=prescribed (last accessed Jan. 7, 2013). Again, even that which is only "advised or recommended" counts as being "prescribed," unless the item in question is "a medicine," *i.e.*, a drug, in which case it must be accompanied by a "written prescription." The ordinary dictionary definitions, then, show that a doctor's advice or recommendation of a treatment can be enough to make it a "prescribed treatment."

In both *Cassiday* and the case it relied on, *Schena v. Secretary of Health and Human Services*, the doctors in question had only once or twice suggested surgeries, do not appear to have strongly urged them upon the claimants. *Cassiday*, 663 F.2d at 749-50; *Schena*, 635 F.2d 15, 19 (1st Cir. 1980). Here, in contrast, Dr. Ritterhoff tried on repeated occasions to convince Plaintiff to change his behavior, to undergo more frequent treatment or day hospitalization, or to change his medications, and opined several times that Plaintiff could not improve by medication alone. Instead of noting that Plaintiff offered substantial reasons for his refusals, Dr. Ritterhoff noted again and again that Plaintiff simply did not want to make the changes necessary to improve his condition.

Plaintiff has attempted to characterize his failure to adhere to Dr. Ritterhoff's suggestions as mere objections to certain treatments, while claiming that he is compliant with those treatments, which include only medications, "actually prescribed." While remaining cognizant of the need to avoid a complete relaxation of the term "prescribed," the Court notes that if Plaintiff flatly refuses to undergo a recommended or suggested treatment, then it would be highly unlikely that Dr. Ritterhoff would go ahead with further steps to formally "prescribe" such a

treatment, especially where the treatment is not a drug, assuming there were further formal steps to take. In the case of group therapy, more-frequent treatment, or day hospitalization, it would make no sense for the doctor to schedule these things when the patient has clearly indicated that he is not interested in them; the doctor has no power to force a patient to attend them, so it would be useless for him to schedule something that will not occur. Likewise, simple behavioral changes such as those continually advocated by Dr. Ritterhoff cannot be "prescribed" in any formal way, yet according to Dr. Ritterhoff these would be among the most effective "treatments" for Plaintiff. A claimant should not be able to defeat § 404.1530 simply by refusing a treatment before the physician has been able to take formal steps to implement it, or by refusing to undertake a treatment that cannot be formally "prescribed." In such a case, serious, repeated recommendations such as those made by Dr. Ritterhoff constitute "prescribed treatments" within the terms and spirit of the regulations.

Because the ordinary meaning of the term "prescribed treatment" would seem to include Dr. Ritterhoff's recommendations, and because Plaintiff points to no caselaw or agency interpretations narrowing this meaning, the Court finds that Dr. Ritterhoff's recommendations constitute "prescribed treatment" and that the ALJ thus did not err in relying on them to deny benefits.

### B.    Whether Plaintiff's refusal to comply with the recommended treatments was justified

Plaintiff also argues that, even if Dr. Ritterhoff's recommendations are sufficient under § 404.1530, he is excused from compliance under the regulation because his failure to comply is a symptom of his mental illness. None of the

examples given in § 404.1530(c) pertain to mental illness, and SSR 82-59's "not all-inclusive" list of possible excuses does not mention mental illness. However, some courts have held that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (quoting *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa. 1996)). In *Pate-Fires*, which Plaintiff cites, there was "no medical evidence, i.e., a discussion by a doctor or other professional, which indicate[d] [the claimant's] noncompliance at any time was a result of something other than her mental illness." *Id.* at 946. Instead, her mental health records showed that the claimant often did not believe that she needed any treatment at all. *Id.*

Here, though, Dr. Ritterhoff himself noted that Plaintiff, while recognizing that he was not well and needed treatment, often resisted any discussion of new or different treatments though Dr. Ritterhoff made efforts to ensure that Plaintiff would be able to afford the treatments. Plaintiff himself argues that he was compliant with the treatments "actually prescribed," showing that he was capable of and willing to comply with some of the treatments suggested to him. (Doc. 17-1 at 13-14). Therefore, contrary to Plaintiff's suggestion, and unlike the mentally ill claimant in *Pate-Fires*, it does not appear that Plaintiff was incapable of making rational judgments about his condition or the necessity of treatment.

Dr. Ritterhoff in fact noted several times that Plaintiff's primary goal seemed to be to obtain Social Security benefits. In this case, therefore, there was substantial evidence, from Plaintiff's treating physician, that Plaintiff's mental illness did not

itself cause his failure to comply with recommended treatments, and, indeed, that his motivation for this refusal may have been to obtain benefits; it was therefore reasonable for the ALJ to reject the notion that Plaintiff's mental illness caused him to refuse treatment.

Plaintiff claims that the ALJ's suspicion of "malingering" is an example of him trying to "have it both ways" by finding Plaintiff credible as to the effects of his untreated mental illness while finding him non-credible as to his motivations for refusing treatment. (Doc. 17-1 at 19-20). An ALJ is not required to accept or reject a plaintiff's credibility as a unit – common sense and experience says that a person can be credible as to certain facts, and non-credible as to others, depending on their circumstances and motivations. It was quite reasonable for the ALJ to find, especially when backed by Dr. Ritterhoff's observations, that Plaintiff was telling the truth about his symptoms, but that he may have been motivated to avoid treatment in order to obtain Social Security benefits.

Aside from his mental illness, Plaintiff offers no other reason for his refusal to accept treatment. Plaintiff's refusal to accept treatment thus justified the ALJ's decision to deny benefits under § 400.1530.

## II. Whether ALJ's questions to the vocational expert were adequate

In determining that, with treatment, Plaintiff would not meet or equal the requirements of a Listing, the ALJ found that he would have "moderate limitations with concentration, persistence or pace." (Tr. 54). The ALJ's questions to the vocational expert did not include any reference to "moderate limitations with concentration, persistence, or pace," and Plaintiff now argues that this justifies a

remand for further fact-finding. (Doc. 17 at 21-23). It is true that the ALJ did not ask the vocational expert any questions related to limitations with concentration, persistence, or pace. He also did not include such a limitation in Plaintiff's with-treatment RFC. Neither of these exclusions constitutes error on the part of the ALJ.

In the sequential evaluation process outlined above and implemented by the ALJ, an ALJ must determine the RFC, then determine whether there are sufficient jobs that the claimant can perform with that RFC. As did the ALJ here, ALJs often consult with vocational experts in performing gathering information pertinent to the latter question. Because the determination that there are sufficient jobs is dependent on the claimant's RFC, the ALJ's questions to the vocational expert should reflect that RFC. Here, if the RFC properly excluded the claimed "moderate limitations with concentration, persistence, or pace," then there was no need to ask the vocational expert about such limitations – the RFC, if properly determined, encompasses all of the claimant's work-related abilities and limitations, so a hypothetical question with all of its limitations will allow a vocational expert to accurately testify as to whether there are jobs the claimant can perform. Therefore, though he does not identify it as such, Plaintiff's true complaint is with the exclusion of these claimed limitations from the with-treatment RFC, which resulted in the exclusion of those limitations from the hypotheticals posed to the vocational expert.[11]

---

[11]    *O'Connor-Spinner v. Astrue*, cited by Plaintiff, is thus obviously distinguishable. 627 F.3d 614, 617-21 (7th Cir. 2010). There, the ALJ *did* include the "limitation on concentration, persistence, and pace" in his RFC assessment, but failed to include it in his questions to the vocational expert. *Id*. at 617-18. Therefore, the vocational expert was not able to consider whether a person with the claimant's

As explained by the ALJ, the "moderate limitations" found as part of the ALJ's evaluation of whether Plaintiff would meet or equal a Listing with treatment are not determined under the same set of criteria required in formulating an RFC or otherwise evaluating a claimant's work abilities. (Tr. 54). Instead, the RFC requires "a more detailed assessment by itemizing various functions." (Tr. 54 (citing SSR 96-8p)). These functions overlap with the "broad categories" of "paragraph B" of the mental disorder Listings, but "must be expressed in terms of work-related functions," not in medical or mental-health terms. SSR 96-8p. Such work-related functions "include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p.

The ALJ noted that the RFC he arrived at "reflects the degree of limitation" that was found in the "paragraph B" analysis. (Tr. 54). Reviewing the ALJ's discussion of Plaintiff's abilities with regard to concentration, persistence, or pace, the Court finds that the ALJ thoroughly explained his reasoning and supported it with citations to substantial evidence. (Tr. 54-59). The ALJ noted under the "paragraph B" analysis Plaintiff's testimony that his "attention span depends on the situation," and that he is able to focus on television, even watching up to three football games in one day and being able to "discuss them in detail." (Tr. 54). In

_____

actual limitations would be able to perform a sufficient number of jobs, and remand was required. *Id*. at 620-21. Here, the ALJ did not include a "moderate limitation on concentration, persistence, and pace" in the RFC, so the root question is whether that exclusion was justified, not whether the ALJ should have asked the vocational expert about such a limitation – there is no reason to ask about a claimed limitation that does not affect one's work abilities.

January 2008, Dr. Pogue noted that Plaintiff, who was then taking his medication, appeared to have "intact" memory and concentration," which finding was noted by the ALJ. (Tr. 54, 455). This shows that Plaintiff's claimed concentration problems could be improved with treatment such that he could live up to the RFC found by the ALJ, which included a limitation to "simple, repetitive tasks."[12] (Tr. 55). Plaintiff cites no evidence or argument that, if he were to accede to appropriate treatment, his "moderate limitations with concentration, persistence, or pace" would affect any particular work-related functions not accounted for in the RFC found by the ALJ. Finally, the ALJ's RFC finding was supported by Dr. Boyenga's evaluation of Plaintiff's work abilities, and is consistent with it; again, Plaintiff points to no evidence that contradicts Dr. Boyenga's conclusions, which must be treated as the opinion of an expert. SSR 96-6p. The ALJ's RFC finding, and his resulting questions to the vocational expert, were thus supported by substantial evidence.

---

[12]    Again, *O'Connor-Spinner* is inapplicable, though it holds that a hypothetical to the vocational expert regarding "simple, repetitive tasks" does not substitute for an RFC including "moderate limitations with concentration, persistence, or pace" – that case was about whether the vocational expert was given the proper information to evaluate whether the limitations of a person's RFC precluded work. 627 F.3d at 619. It did not concern the question presented here – whether an RFC limitation of "simple, repetitive tasks" is sufficient if, under the "paragraph B" analysis, the ALJ found "moderate limitations with concentration, persistence, or pace."

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 17) is DENIED and Defendant's Motion for Summary Affirmance (Doc. 21) is GRANTED. CASE TERMINATED.

IT IS SO ORDERED.

Entered this <u>9th</u> day of January, 2013.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
